**FIREMAN'S FUND INSURANCE COMPANIES and American Insurance Company, Plaintiffs,**

v.

**EX–CELL–O CORPORATION, et al., Defendants.**

**EX–CELL–O CORPORATION, et al., Third–Party Plaintiffs,**

v.

**AIU INSURANCE COMPANY (Successor to American International Insurance Company), et al., Third–Party Defendants.**

No. 85–CV–71371.

United States District Court,
E.D. Michigan, S.D.

Aug. 30, 1990.
As Amended Nov. 19, 1990.

Jeffrey Silberfeld, Rivkin, Leff & Radler, Uniondale, N.Y., Michael G. Costello, Plunkett & Cooney, Detroit, Mich., for American Intern. Ins. Co.

Eugene R. Anderson, Lynn A. Stansel, Nicholas J. Zoogman, New York City, Robert B. Webster, Richard C. Sanders, Peter

Metters, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for Ex–Cell–O, McCord and Davidson.

Barry M. Kelman, Gofrank and Kelman, Southfield, Mich., H.G. Sparrow, III, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., Mary Vyskocil, Simpson, Thacher & Bartlett, New York City, for Travelers Ins.

John W. Henke, Gropman, Lebow & Tobin, Birmingham, Mich., Paul L. Gingras, Zelle & Larson, Minneapolis, Minn., for Wausau Ins. Co.

Paul S. Koczkur Harvey, Kruse, Westen & Milan, Detroit, Mich., for Integrity Ins. Co.

Peter B. Kupelian, Tucker & Rolf, Southfield, Mich., for Zurich American Ins. Co.

Leonard B. Schwartz, Sommers, Schwartz, Silver & Schwartz, Southfield, Mich., for Royal Indem.

Deborah A. Pitts, Robert A. Zeavin, Buchalter, Nemer, Fields, Chrystie & Younger, Los Angeles, Cal., James R. Case, Kenneth C. Harrison, Kerr, Russell and Weber, Detroit, Mich., for AIU Ins. Co. and Highland Ins. Co.

Charles C. Cheatham, Dwight Robinson, James G. Gross, MacArthur, Cheatham, Acker & Smith, Detroit, Mich., for American Employers Ins. Co.

David M. Tyler, Sullivan, Ward, Bone, Tyler, Fiott & Asher, Southfield, Mich., Michael G. Bruton, Michael J. Merlo, Pretzel, Stouffer, Chartered, Chicago, Ill., for Prudential Re–Insurance Co.

Andrea Sykes Foote, Lord, Bissell & Brook, Chicago, Ill., Thomas F. Myers, Garan, Lucow, Miller, Seward, Cooper & Becker, Detroit, Mich., for Certain Underwriters at Lloyd's, London and London Market Ins. Co.

Stephen M. Kelley, Kitch, Saurbier, Drutchas, Wagner & Kenney, Detroit, Mich., Mitchell L. Lathrop, Adams, Duque & Hazeltine, San Diego, Cal., for St. Paul Fire & Marine Ins. Co.

James R. Case, Kenneth C. Harrison, Kerr, Russell & Weber, Detroit, Mich., for Federal Ins. Co.

Michael W. Hartmann, Miller, Canfield, Paddock & Stone, Detroit, Mich., Timothy C. Russell, Wilson M. Brown, III, Patricia A. Gotschalk, Drinker, Biddle & Reath, Washington, D.C., for Am. Motorists, Am. Manu. Mut., Lumbermens Mut.

Paul S. Koczkur, Harvey, Kruse, Westen & Milan, Detroit, Mich., for Mission Ins. Co. and Mission Nat.

T. Joseph Seward, Bernard P. McClorey, Ronald G. Acho, Cummings, McClorey, Davis & Acho, Livonia, Mich., L. Anthony Sutin, William J. Bowman, Hogan & Hartson, Washington, D.C., for Hartford Acc. and Nelson R. Goodrich.

Scott L. Gorland, Phyllis Golden Morey, Barbara Colby Tanase, Pepper, Hamilton & Scheetz, Detroit, Mich., Stephen Jacobs, Amy B. Gallent, Siff, Newman, Rosen & Parker, New York City, for First State Ins. and New England Reins. Corp.

James N. Martin, Victor Van Kamp, Martin, Bacon & Martin, Mt. Clemens, Mich., John W. Stamper, O'Melveny & Myers, Los Angeles, Cal., for Pacific Employers Ins. Co.

William Jamieson, Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald, Southfield, Mich., for Northbrook Excess and Surplus Ins. Co. ("NESCO").

J.R. Zanetti, Jr., Highland & Currier, P.C., Southfield, Mich., for Transport Indem. Co.

## AMENDED MEMORANDUM OPINION AND ORDER

FEIKENS, District Judge.

Plaintiff insurers, Fireman's Fund Insurance Companies and American Insurance Company, filed this suit for declaratory judgment against their insureds Ex–Cell–O Corporation ("Ex–Cell–O"), McCord Gasket Corporation ("McCord"), and Davidson Rubber Company ("Davidson") (collectively "policyholders"),[1] and two other insurers of

---

1. Davidson is a wholly-owned subsidiary of McCord, which in turn is a wholly-owned sub-

sidiary of Ex–Cell–O.

policyholders, Travelers Insurance Company and Employers Insurance of Wausau. Policyholders, in turn, filed a third-party complaint seeking declaratory judgment against Travelers, Wausau, and additional insurers.[2]

The parties seek a declaration of their respective rights and obligations under comprehensive general liability ("CGL") and excess liability insurance policies. Policyholders have received notices from the United States Environmental Protection Agency ("EPA") and state agencies that they may be potentially responsible for environmental contamination at a number of landfill sites and a plant site, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," otherwise known as Superfund), 42 U.S.C. §§ 9601–75, and state statutes. Policyholders notified insurers of these claims and of their contentions that the policies at issue cover environmental cleanup costs for which they may be held liable. Insurers denied liability.

## I. Procedural History

Various settlements have been negotiated between policyholders and insurance companies. Four sites remain—Cardinal landfill (Farmington, New Hampshire), Dover Municipal landfill (Tolend Road) (Dover, New Hampshire), Farmington Plant Site (Farmington, New Hampshire), and Ottati & Goss (Kingston Steel Drum) (Kingston, New Hampshire). Four insurance companies also remain. Wausau was the primary carrier from 1970 to 1979. Companies which issued excess coverage policies are American Employers, First State, and New England.

Previous opinions in this case address numerous related issues. I concluded that the insurance companies have a duty to defend policyholders against the claims of government regulatory agencies; that the "owned property" exclusion does not apply because the claims at the Farmington plant site include property damage to adjoining landowners and to the public; and that each exposure of a pollutant to the environment constitutes an "occurrence" and triggers coverage. *Fireman's Fund Insurance Co. v. Ex–Cell–O Corp.*, 662 F.Supp. 71 (E.D.Mich.1987), *motion for leave to appeal denied*, 682 F.Supp. 34 (E.D.Mich. 1987). In a later opinion, I concluded that "sudden" in the "sudden and accidental" exception to the pollution exclusion clause "includes the temporal component of briefness, and means 'brief, momentary, or lasting only a short time.' " *Fireman's Fund Insurance Co. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1326 (E.D.Mich.1988) (citing *United States Fidelity and Guaranty Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988)), *reconsideration denied*, 720 F.Supp. 597 (E.D.Mich.1989).

At the onset of a bench trial[3], I considered a number of dispositive motions and granted partial summary judgment as to the Cardinal landfill and Dover Municipal landfill sites to AIU Insurance Company and Highlands Insurance Company for all years for which they issued policies to policyholders; to Wausau for the policy periods January 1, 1973 through January 1, 1979; and to New England for the policy periods January 1, 1975 through January 1, 1979. I granted summary judgment also as to the Keefe Environmental Services site (Epping, New Hampshire) to Highlands Insurance Company, American Employers, and First State for all years for which they

**2.** AIU Insurance Company, American Employers Insurance Company, American Manufacturers Mutual Insurance Company, American Motorists Insurance Company, Associated International Insurance Company, certain underwriters at Lloyd's, London and London Market Insurance Companies, Federal Insurance Company, First State Insurance Company, Highlands Insurance Company, Integrity Insurance Company, Lumbermens Mutual Casualty Company, Midland Insurance Company, Mission Insurance Company, New England Reinsurance Corporation, Northbrook Excess and Surplus Insurance Company (successor to Northbrook Insurance Company), Pacific Employers Insurance Company, Prudential Re–Insurance Company, Royal Indemnity Company, St. Paul Fire and Marine Insurance Company, The Hartford Accident and Indemnity Insurance Company, Transport Indemnity Company, and Zurich Insurance Company.

**3.** Jury trial was waived by the parties.

issued policies to policyholders; to New England for the policy periods January 1, 1975 through January 1, 1978; and to Wausau for the policy periods January 1, 1970 through January 1, 1978. I found that insurers are not liable to indemnify policyholders for the Cardinal and Dover sites under policies containing the pollution exclusion clause.[4]

On the third day of trial, policyholders withdrew all claims for insurance coverage in connection with the Keefe Environmental Services site. Policyholders also withdrew their claims for coverage as to the Ottati & Goss site under all policies containing the pollution exclusion clause. On the fifth day of trial, the claims against AIU Insurance Company and Highlands Insurance Company were dismissed because those parties negotiated a settlement with policyholders.

At the conclusion of the trial, I granted a motion for partial judgment of no cause of action as to the Farmington plant and Ottati & Goss sites to American Employers because policyholders failed to produce evidence of an "occurrence" at either site during the American Employers' policy years, February 1969 through February 1972. I also granted a motion for judgment of no cause of action as to the Ottati & Goss site to First State because policyholders failed to produce evidence of an "occurrence" at that site during First State's policy years, January 1972 through January 1975.

## II. Background

### A. Insurance Policies

Thirteen CGL insurance policies remain at issue in this action. Wausau issued nine primary insurance policies to McCord. (PX 73–80). American Employers and First State each issued one excess insurance policy to McCord. (PX 31 and 62, respectively). New England issued two excess insurance policies to McCord. (PX 115, 156). Each of these primary and excess policies names Davidson as an additional named insured. Chart I depicts a summary of policyholders' insurance coverage at issue in this case:

### Chart I

| Company | Policy Number | Policy Period |
| --- | --- | --- |
| Wausau | 1721 00 040499 | 1/1/70–1/1/71 |
| | 1722 00 040499 | 1/1/71–1/1/72 |
| | 1723 00 040499 | 1/1/72–1/1/73 |
| | 1724 00 040499 | 1/1/73–1/1/74* |
| | 1725 00 040499 | 1/1/74–1/1/75* |
| | 1726 00 040499 | 1/1/75–1/1/76* |
| | 1727 00 040499 | 1/1/76–1/1/77* |
| | 1728 00 040499 | 1/1/77–1/1/78* |
| | 1729 00 040499 | 1/1/78–1/1/79* |
| American Employers | A22–8500–266 | 2/1/69–2/1/72 |
| First State | 900305 | 2/1/72–1/1/75 |
| New England | 681199 | 1/1/75–1/1/78* |
| | 683658 | 1/1/78–1/1/79* |

* Indicates policy containing a pollution exclusion clause

---

4. The pollution exclusion clause reads:
   This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The central question presented is whether the insurance policies require insurers to indemnify policyholders for clean-up costs they may become obligated to pay for damages caused by groundwater contamination at four sites. Each policy states that the insurance company is obligated to

> pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence....

Most of the insurance policies define an "occurrence" in the following terms:

> "occurrence" means an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in ... property damage neither expected nor intended from the standpoint of the insured....

The earlier policies refer to "injurious exposure to conditions" rather than "continuous or repeated exposure to conditions."[5]

### B. Farmington Plant Site

On one of the four sites is a manufacturing plant owned and operated by Davidson in Farmington, New Hampshire, and property adjacent to the plant. New Hampshire ("the State") has notified Davidson that it may be held liable for clean-up costs resulting from groundwater contamination at this site under the New Hampshire Hazardous Waste Management Act, N.H.Rev. Stat.Ann. Chapter 147–A. (PX 203).

Davidson has manufactured instrument panels, bumpers, fascias, and other automobile parts at the Farmington Plant since 1966. The manufacturing process involves a heat-molding process to produce vinyl shells, washing and painting shells, and injecting urethane foam between a shell and a rigid metal or plastic insert.

The manufacturing process at Farmington generates various solid and liquid wastes. These wastes include sludge from a vapor degreasing process that uses perchlorethylene to remove oil from metal structural inserts; waste plastisol generated from shell manufacture; paint waste, including toluene, xylene, and methyl ethyl ketone ("MEK"), generated by cleaning paint guns and ventilation booths; soapy liquid and solid waste from washing completed parts; methylene chloride used to flush the urethane foam-making nozzles; semi-solid sludge ("still bottoms") from distilling foam and methylene chloride to reclaim methylene chloride; shellsol soaked rags used to wipe off vinyl shells; and vinyl and urethane scraps.

Testing at the Farmington site shows extensive groundwater contamination. The chemicals found include chemicals used in the Davidson manufacturing process: perchlorethylene, trichloroethylene, dichloroethylene, vinyl chloride, toluene, and methylene chloride. (Tr. 1210, DX 71, PX 274, 318, 322).

### C. Cardinal Landfill Site

The Cardinal site, also in Farmington, New Hampshire, is a landfill to which policyholders shipped chemical wastes. The State has notified Davidson that it may be held liable for clean-up costs resulting from groundwater contamination at this site. (PX 185).

High concentrations of volatile organic compounds have been found in the groundwater at the Cardinal landfill site. (Tr. 1195–96). These compounds include methylene chloride, acetone, trichloroethylene, toluene, xylene, and MEK, all of which were used by Davidson in its manufacturing operations at the Farmington plant. (Tr. 1197–98).

### D. Dover Landfill Site

Policyholders also shipped chemical wastes to the Dover Municipal Landfill,

---

**5.** The only other difference in the language of the remaining policies is that the New England policies and the Wausau policies covering January 1, 1973 through January 1, 1979 contain a pollution exclusion clause that provides:

> This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

which is owned and operated by the City of Dover. EPA has notified Davidson that it may be held liable for clean-up costs resulting from groundwater contamination at this site. (PX 204).

Since 1961, Davidson operated a manufacturing plant at Dover, New Hampshire, which produces automobile accessories by means of a process similar to that used at the Davidson plant in Farmington. The chemicals used and the chemical wastes produced are substantially similar to those at the Farmington plant.

The Dover plant has continuously deposited all of its waste, both solid and liquid, at the Dover landfill. In the late 1970s, the Dover landfill no longer accepted liquid wastes for disposal and closed completely in 1979. Testing at the Dover landfill site shows groundwater contamination from chemicals used in the Davidson manufacturing process, including xylene, dichloroethylene, and trichloroethylene. (Tr. 1187).

### E. Ottati & Goss Site

Ottati & Goss is a former drum reconditioning facility in Kingston, New Hampshire, to which Davidson sent used drums from the mid–1960s through 1976, allegedly containing chemical residues, to be cleaned and repainted. A former owner and operator of this site, International Minerals and Chemicals Company, which has been held liable under CERCLA for property damage at the site, has sued Davidson for contribution to its costs of cleaning up the site. Contamination at the site includes trichloroethylene, dichloroethylene, xylene, and toluene. (PX 196).

### III. Issues

This case presents several legal issues: 1) whether cleanup costs are "damages" for the purposes of insurance coverage; 2) whether insurers have a duty to indemnify policyholders for cleanup costs policyholders may become obligated to pay;[6] and 3) whether the duty to defend continues when the duty to indemnify has been resolved.

Resolution of these legal issues is governed by Michigan law. In a diversity action, the forum state's choice of law rules apply. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Michigan follows the rule that the nature and effect of a contract are determined by the law of the place where the contract was made. *Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 451 F.Supp. 1230, 1237 (E.D.Mich.1978), *aff'd* 633 F.2d 1212 (6th Cir.1980), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). If the place of performance differs from the place where the contract was made, then the law of the place of performance governs. *Liberty Mutual Insurance Co. v. Vanderbush Sheet Metal Co.*, 512 F.Supp. 1159, 1166–69 (E.D.Mich.1981) (citing *George Realty Co. v. Gulf Refining Co.*, 275 Mich. 442, 451, 266 N.W. 411, 414–15 (1936)); *Podlaha v. Management Recruiters International, Inc.*, 171 Mich.App. 1, 3–4, 429 N.W.2d 622, 624 (1988). Because the parties agree that the place of performance is Michigan, that law applies.

An insurance policy is a contract. Courts must interpret contracts to give effect to the parties' intended agreements. *Eghotz v. Creech*, 365 Mich. 527, 530, 113 N.W.2d 815, 816 (1962) ("[A] policy of insurance is much the same as any other contract. It is a matter of agreement by the parties. The courts will determine what that agreement was and enforce it accordingly."); *Murphy v. Seed–Roberts Agency, Inc.*, 79 Mich.App. 1, 7–8, 261 N.W.2d 198, 201 (1977). The parties' intent is determined by the plain meaning of the policy language. *Equitable Life Insurance Co. v. Michigan National Bank*, 484 F.Supp. 1176, 1178 (W.D.Mich.1980); *Henry v. J.B. Publishing Co.*, 54 Mich.App. 409, 412–13, 221 N.W.2d 174, 175 (1974).

### IV. Analysis

#### A. Clean–Up Costs as "Damages"

Each policy provides that the insurance company is obligated to "pay on behalf of the insured all sums which the insured

---

6. Insurers admit the existence of the policies and the timely payment of premiums.

shall become legally obligated to pay as *damages*...." (emphasis added) The parties dispute whether clean-up costs are "damages" under CERCLA and the New Hampshire Hazardous Waste Management Act.

Insurers offer two arguments to support their proposition that clean-up costs are not damages. First, insurers assert that the statutes at issue in the underlying actions are equitable in nature and require a liable party to pay clean-up "costs," rather than damages as a legal action would require. Second, insurers argue that clean-up costs are not damages because they are paid pursuant to exercise of the government's police power.[7]

The Michigan Supreme Court has not addressed the "damages" question. Recently, it granted appeal in a case that raises the issue. *Upjohn Co. v. New Hampshire Insurance Co.*, Nos. 86906, 86907, 86908 (Mich.S.Ct. July 13, 1990). I choose not to base my decision on the technical question of whether clean-up costs are "damages" as defined in the insurance policies because resolution of this issue is not necessary for a decision in this case. Courts across the country are divided.[8] Lower courts in Michigan are divided as well.[9] I defer to the Michigan Supreme

---

**7.** *AIU Ins. Co. v. Superior (FMC Corp.)*, 213 Cal. App.3d 1219, 262 Cal.Rptr. 182 (1989), *review granted and opinion superseded by*, 49 Cal.3d 919, 264 Cal.Rptr. 354, 782 P.2d 595 (1989).

**8.** Numerous federal cases support insurers' position. *See, e.g., Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979, 981 (4th Cir.1988) (interpreting Maryland and South Carolina law); *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 985–87 (8th Cir.1988) (en banc) (interpreting Missouri law), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348, 1351–54 (4th Cir.1987) (interpreting Maryland law), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325, 1329 (4th Cir.1986) (interpreting Maryland law); *A. Johnson & Co., Inc. v. Aetna Casualty and Sur. Co.*, 741 F.Supp. 298 (D.Mass.1990) (interpreting Maine law); *Aetna Casualty & Sur. Co. v. Gulf Resources & Chem. Corp.*, 709 F.Supp. 958, 961–62 (D.Idaho 1989) (interpreting Idaho law); *Travelers Indem. Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252, 1255–56 (D.Md.1989) (interpreting Maryland law); *Hayes v. Maryland Casualty Co.*, 688 F.Supp. 1513, 1514–15 (N.D.Fla. 1988) (interpreting Florida law); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F.Supp. 950, 954–55 (N.D.Ill.1988) (interpreting Illinois law); *Travelers Ins. Co. v. Ross Elec., Inc.*, 685 F.Supp. 742, 743–45 (W.D.Wash.1988) (interpreting Washington law).

Numerous cases also support policyholders' arguments. *See, e.g., Avondale Indus. Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206–07 (2d Cir.1989) (interpreting New York law), *cert. denied*, —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 558, 565 (D.Del.1989) (interpreting Maryland and Delaware law, rejecting *Armco* ); *National Indem. Co. v. United States Pollution Control, Inc.*, 717 F.Supp. 765, 766–67 (W.D.Okla.1989) (interpreting Oklahoma law); *Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 172–

74 (M.D.Pa.1989) (interpreting Pennsylvania law); *Intel Corp. v. Hartford Accident & Indem. Co.*, 692 F.Supp. 1171, 1189–90 (N.D.Cal.1988) (interpreting California law); *New York v. Amro Realty Co.*, 697 F.Supp. 99, 102 n. 5 (N.D.N.Y. 1988) (in dicta, interpreting New York law); *New Castle County v. Hartford Accident & Indem. Co.*, 673 F.Supp. 1359, 1365–66 (D.Del. 1987) (interpreting Delaware law); *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394, 398–400 (D.N.J.1987) (interpreting New Jersey law); *Centennial Ins. Co. v. Lumbermens Mut. Casualty Co.*, 677 F.Supp. 342, 349–50 (E.D.Pa.1987) (interpreting Pennsylvania law).

State supreme courts are split as to whether response costs are damages as well. One state supreme court supports insurers' position. *Patrons Oxford Mut. Ins. v. Marois*, 573 A.2d 16, 18–19 (Me.1990). State supreme courts supporting policyholders' interpretation are: *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 698–701, 555 N.E.2d 576, 582–84 (1990); *Minnesota Mining and Manufacturing Co. v. Travelers Indemnity Co.*, 457 N.W.2d 175, 178–82 (Minn.1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 388 S.E.2d 557, 565–69 (1990); *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 Wash.2d 869, 878–88, 784 P.2d 507, 511–16 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724, 728–30 (Wyo.1988).

**9.** Several cases interpreting Michigan law support insurers' theory. *See, e.g., Jones v. Farm Bureau Mut. Ins. Co.*, 172 Mich.App. 24, 29, 431 N.W.2d 242, 245 (1988); *Arco Indus. Corp. v. Home Indem. Co.*, No. 87–0218–CK (Mich.Cir. Ct., Kalamazoo Cty.1989). Several other cases support policyholders' position. *See, e.g., Higgins Indus., Inc. v. Fireman's Fund Ins. Co.*, 730 F.Supp. 774, nn. 1 & 3 (E.D.Mich.1989) (interpreting Michigan law); *United States Fidelity and Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1168 (W.D.Mich.1988) (interpreting Michigan law); *Polkow v. Citizens Ins. Co. of America*, 180 Mich.App. 651, 657–59, 447

Court as the final arbiter of Michigan law to resolve the "damages" question.

### B. Duty to Indemnify

As to the insurers' contractual duty to indemnify policyholders, I hold that policyholders have not proved an occurrence resulting in property damage at the Farmington site within the relevant policy periods. Even if policyholders could show an occurrence resulting in property damage, I find that policyholders cannot prevail because they expected the resulting damage. As to the Cardinal landfill and Dover landfill sites, I hold that policyholders expected the resulting damage. Finally, I hold that policyholders have not proved an occurrence resulting in property damage at the Ottati & Goss site.

#### 1. *Farmington Plant Site*

Insurers and policyholders present different versions as to how the Farmington plant site became polluted. Insurers describe the impact of policyholders' day-to-day manufacturing processes and practices, which they claim resulted in extensive damage to the environment that was expected or intended by policyholders. Policyholders describe how two "sudden and accidental" spills of perchlorethylene, one at a storage tank in 1977 and the other from a pipe rupture in 1978, caused the environmental damage. Policyholders assert that these incidents fulfill the "occurrences" requirement under the policies and that the incidents were neither expected nor intended. For the following reasons, I find that insurers' explanation is supported by the evidence.

##### a. Occurrence Resulting in Property Damage

Policyholders bear the burden of proving an "occurrence" during each policy period for which they seek coverage from each insurance company. *Fireman's*

N.W.2d 853, 856–57 (1989), *appeal granted,* No. 87617 (Mich.S.Ct. July 13, 1990); *Upjohn Co. v. New Hampshire Ins. Co.,* 178 Mich.App. 706, 444 N.W.2d 813, 819 (1989), *appeal granted,* Nos. 86906, 86907, 86908 (Mich.S.Ct. July 13, 1990); *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 588–90, 336 N.W.2d 838, 842–43 (1983).

*Fund Insurance Co.,* 662 F.Supp. at 76 ("The policies cover occurrences within the policy period. I hold that each exposure of the environment to a pollutant constitutes an occurrence and triggers coverage."); *Clark v. Hacker,* 345 Mich. 751, 756, 76 N.W.2d 806, 809 (1956); *see also Fischer & Porter Co. v. Liberty Mutual Insurance Co.,* 656 F.Supp. 132, 136 (E.D.Pa.1986). The general rule is that an insured bears the burden of proving coverage for its claims. *Elston–Richards Storage Co. v. Indemnity Ins. Co. of North America,* 194 F.Supp. 673, 678–79 (W.D.Mich.1960) (interpreting Michigan law), *aff'd,* 291 F.2d 627 (6th Cir.1961); *see also* J. Appleman, *Insurance Law and Practice* § 12094, at 24 (1980) ("One suing on a liability policy must establish that the loss fell within its terms."). In other words, policyholders must prove as to each site that property damage occurred because their contaminants were released into the environment during the period of each policy under which they seek indemnification.[10]

Policyholders' theory, that the damage resulted from two "sudden and accidental" chemical spills on the plant grounds, is not supported by the evidence. Policyholders claim that the greatest groundwater concentration of contamination was found near the solvent storage tanks and the pipe rupture. I find that policyholders have failed to prove an occurrence resulting in property damage during the policy periods.

In 1977, perchlorethylene was regularly delivered to solvent storage tanks located on the plant grounds by an outside supplier. (Tr. 795–98). Policyholders allege that on one occasion a tank truck driver mistakenly overfilled a tank, resulting in a 70–gallon spill of perchlorethylene. Gary Rollins, the Davidson employee responsible for the tanks, testified that he observed a large

10. The policies define an occurrence as

an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in ... property damage....

pool of solvent on the concrete pad supporting the tank. (Tr. 800–802).[11] Policyholders also claim that contamination at the Farmington plant site was caused by a rupture in 1978 of a pipe transporting perchlorethylene from a storage tank to the plant.[12] (Tr. 805).

For the following reasons, the storage tank spill and the pipe rupture cannot explain the contamination at the Farmington site. Because it is just as likely that the contamination occurred after the expiration of the last policy in 1979 or that the contamination resulted from the day-to-day operations of the Farmington plant, I find that policyholders have not carried their burden of proving an occurrence.

From the evidence, I find that substantial doubt exists as to whether the spill and pipe rupture actually occurred. Davidson's chief engineer testified to remembering only one chemical spill in his entire career at Davidson from 1966 to 1978. He testified that that spill was inside the plant and was cleaned up immediately. (Tr. 476). Davidson's chemical engineer from 1966 to the present testified that he could not recall any spills that he would characterize as "large." (Tr. 678).

If the spill did occur, I find that the resulting damage was *de minimis*. (Tr. 1409–10, 1426). The only witness to testify regarding the incident was equivocal. He stated that much of the perchlorethylene that spilled onto the concrete pad may have evaporated without permeating the soil. (Tr. 832, *see also*, 1233–34). No reports were made to state or federal governments of any releases exceeding the terms of the plant's surface water discharge permit in effect from 1974 to 1979, despite testimony from a Davidson employee that "spills are supposed to be reported rather quickly." (Tr. 748–49). In a report filed with the State in March 1987, Davidson's environmental consultants specifically stated that the solvent tank storage area was not a significant source of groundwater contamination. (Tr. 1252–53).

The evidence as to the pipe rupture presents similar doubt. Only one witness testified regarding this incident, and he testified only as to its discovery, not its effect. No evidence was presented regarding the quantity of perchlorethylene released, and no evidence was presented to connect this incident with the contamination that is the subject of agency attention.

It is just as likely that such contamination was due to other causes. (Tr. 1226). Policyholders' expert, Dan Morrissey, testified that he was unable to determine either the cause or extent of the contamination at the Farmington plant site to a reasonable degree of scientific certainty. (Tr. 1227–29, 1230–31). He testified that as a hydrogeologist he was unable to determine whether the cause of the contamination was a single release of a pollutant or multiple releases over time. (Tr. 1231–32).

Evidence presented demonstrates that Davidson continued to discharge contaminants into the environment at the Farmington site into the 1980s, after the policies at issue had expired. For example, a memorandum prepared by T.M. Filipiak, environmental analyst of Davidson's parent company, Ex–Cell–O, supports this position. While inspecting a lagoon system on the plant grounds, Filipiak found unacceptably high levels of hazardous solvents and metals. In his memorandum to Davidson management dated October 11, 1982, he stated:

> The discharge of the paint and prime booth wash waters to the lagoon will have a negative impact on area groundwater and with the growing concern over hazardous chemicals entering groundwater systems it is recommended that the plant stop these discharges through the modification of present facilities.

(DX 60, at 1). Despite this knowledge, policyholders continued to discharge con-

---

**11.** Policyholders further contend that because the spill was "sudden and accidental," coverage for the resulting property damage is not excluded by the pollution exclusion clause found in the New England policies and some of the Wausau policies.

**12.** Policyholders claim that this incident was also sudden and accidental.

taminated water into the lagoon system.[13] (DX 156).

Whether property damage was caused during the policy periods at issue or whether it was caused after the most recent policy expired, policyholders have not proved an occurrence resulting in property damage during the policy years. The theory they rely on, that the storage tank spill and the pipe rupture caused the groundwater contamination, is not credible.

b. "Neither Expected Nor Intended"

I find, in the alternative, that even if policyholders could prove an occurrence that resulted in damage during the policy periods, insurers are not obligated to indemnify policyholders because policyholders expected the resulting damage. The definition of occurrence in the policies states that property damage must have been "neither expected nor intended from the standpoint of the insured." I hold that policyholders expected the resulting damage.

■ Under Michigan law, a subjective standard is applied to the "neither expected nor intended" exclusion. *Allstate Insurance Co. v. Freeman*, 432 Mich. 656, 709–10, 443 N.W.2d 734, 759 (1989), *reh'g denied*, 433 Mich. 1202, 446 N.W.2d 291 (1989); *Putman v. Zeluff*, 372 Mich. 553, 556, 127 N.W.2d 374, 376 (1964); *Ray Industries v. Liberty Mutual Insurance Co.*, 728 F.Supp. 1310, 1315 (E.D.Mich.1989). The relevant issue is whether policyholders subjectively expected or intended the resulting property damage.

Under the *Allstate* test, intent may be presumed under certain circumstances. The court in that case discussed a class of cases that involved intentional acts, "the result of which injury can only occur." *Allstate*, 432 Mich. at 719, 443 N.W.2d 734 (citation omitted). "In these cases," stated the plurality, "some courts have quite reasonably presumed that the injury was intentional." *Id.* In a footnote, the court cited an annotation for the proposition that "'the insured's intent may be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm....'" *Id.* at 719 n. 13, 443 N.W.2d 734 (citing Annot., 31 A.L.R. 4th 957, at 973 (1984)). The court also stated that intent may be presumed where an insured's denial of intent "'flies in the face of all reason, common sense and experience.'" *Id.* at 720, 443 N.W.2d 734 (citing *CNA Insurance Co. v. McGinnis*, 282 Ark. 90, 666 S.W.2d 689 (1984)).[14]

■ The parties dispute who has the burden of proof regarding the "neither expected nor intended" clause. I hold that insurers bear the burden of proving that policyholders expected or intended the resulting damage. This interpretation is supported by case law and the general rule of insurance contract interpretation that an insurer must prove the applicability of an exclusion to coverage. *Roddis Lumber & Veneer Co. v. American Alliance Insurance Co.*, 330 Mich. 81, 88, 47 N.W.2d 23, 26 (1951); *Michigan Mutual Liability Co. v. Ferguson*, 15 Mich.App. 298, 302, 166 N.W.2d 525, 527 (1968); *Couch on Insurance* § 79:384 (2d ed. 1983).

■ Under the *Allstate* test, I find that insurers have proved that policyholders expected property damage to result from their practices at the Farmington site. They demonstrated that policyholders' in-

**13.** Filipiak's memorandum also contained the following observation:

> The discharge of paint to the northeast plant storm drain by employees must be halted immediately, with the reprimand of those responsible employees. The State of New Hampshire forbids the discharge of any foreign materials into a storm water system other than storm water, the impact on area waters could be devastating (fish kill, stream discoloration, etc.).

(DX 60, at 3).

**14.** Not surprisingly, insurers and policyholders presented differing documentary evidence and testimony regarding the state of the art of disposal practices in the 1960s and 1970s. While I do not find state of the art evidence irrelevant, I find that under the subjective test I must apply in this case as dictated by *Allstate*, the question is not whether policyholders' practices were state of the art. Rather, the relevant query is whether policyholders subjectively expected or intended to cause damage. Policyholders' expectations or intentions cannot be deduced from conduct other than their own.

tentional practices, including disposal of waste water into the Pokamoonshine Brook tributary; subsequent disposal to the north end of the plant site; and finally disposal into the lagoon system, resulted in groundwater contamination. The evidence supports insurers' theory that policyholders expected property damage to result from their day-to-day manufacturing processes.

To support their position that they did not subjectively expect or intend the resulting damage, present and former employees of Davidson testified that they neither expected nor intended that property damage would result from their operation of the Farmington plant. (Tr. 358–59, 466–67, 542–46, 548–52, 707–08, 738–39). I find these statements are self-serving and not credible. Evidence of policyholders' employees' actions and evidence of descriptions of operations at the Farmington plant more clearly address the question of whether policyholders expected or intended to cause damage. *Allstate* at 719–20, 443 N.W.2d 734. Because of employees' actions and statements as hereinafter set forth, I find policyholders expected the resulting damage.

The design and operation of the Farmington plant facilitated disposal of hazardous liquid waste directly into the environment. Davidson made various modifications to its operation over the years. Initially, waste water was discharged into the Pokamoonshine Brook tributary, then onto the north end of the property, and later into the lagoon system. Consistent, however, throughout these changes was policyholders' direct discharge of contaminants into the environment.

At trial, Davidson's management prided itself on concern for the environment and its employees' health. As early as 1973, according to Coleman Hogan, McCord's Chief Executive Officer from 1965 to 1982, it was a priority to "meet or exceed appropriate government standard[s] for ecology." (Tr. 220, *see also*, 177–79, 219). In the 1960s and 1970s, Davidson acquired advanced knowledge of the hazards to plant workers associated with exposure to chemicals used in its manufacturing pro-

cesses. (Tr. 155–56, 173, 772). As a result of a study conducted by Harvard University scientists at the Farmington plant in the 1960s, Davidson learned of the adverse health effects to its employees caused by exposure to isocyanates. (Tr. 173). Davidson's chief executive officer testified that the company spent "enormous sums" to minimize worker exposure to isocyanates and that it was reasonable to do so. (Tr. 175–176).

Ample evidence illustrates that policyholders knew of the hazardous nature of the waste from its manufacturing processes. Davidson employed doctorate level chemists and chemical engineers and an industrial hygienist. (Tr. 210, 474, 772). John Cochrane, Chief Industrial Engineer at the Farmington plant in the early 1970s, attempted to change the manufacturing methods to reduce the need for solvents and greases that were "very objectionable to our employees and to us and to the environment." (Tr. 290–91). Davidson was concerned with reducing the use of methylene chloride because of groundwater contamination problems associated with its disposal. (Tr. 602–03).

The town precinct engineer, the public official from the Town of Farmington responsible for the quality of the town water supply, was also concerned with the contamination of the Pokamoonshine Brook and the tributary, which in turn fed the town's water supply. The official concluded that Davidson caused the contamination. (Tr. 406–07, 411). In September of 1971, he charged that Davidson was polluting the water supply by discharging contaminants into the Pokamoonshine Brook tributary. (DX 11).

In 1970 Davidson hired several consulting firms, including Environmental Engineers, Inc., to regularly sample plant effluent discharges. (Tr. 306–07, 407–08, 409–11, 419–21, 428–29, DX 3). Test results showed the presence of volatile suspended solids indicating chemical contamination. (Tr. 477–78, 493, 610–12, DX 12, 24, 25, and 26). By December 10, 1971, Davidson management stated that from a "legal and community relations standpoint"

all water flowing from the plant to the Pokamoonshine Brook tributary should first be treated to remove "both bacteria and the grease, oil and solvent-type pollutants." (DX 15, *see also* Tr. 474).

In a report dated April 24, 1973, Davidson's utilities engineer told its chief engineer that five out of eight process discharges to the Pokamoonshine Brook tributary contained chemical contamination. (DX 22). The utilities engineer recommended rerouting the discharge to the north end of the plant property. The chief engineer stated that at the time of the recommendation, he knew that contaminated liquid wastes were flowing into the Pokamoonshine Brook. (Tr. 479–80, DX 24). Based on his knowledge, the chief engineer viewed rerouting as a "temporary solution." (Tr. 314–15, 372).

The north end discharge averaged approximately 14,000 gallons per day by July 16, 1973. (DX 29). In a letter to the plant utilities engineer, Davidson's environmental consultant stated, "The waste is dirty grey in color and contains substantial quantities of paint solids and foam grindings." (DX 29, *see also* Tr. 321). The consultants also proposed a treatment method that would require a $50,000 capital investment and an estimated $9,000 annual cost which would "yield an effluent suitable for discharge to a surface water drainage course." (DX 29, *see also* Tr. 386). Davidson did not adopt this plan and continued to discharge contaminants into the environment.

In August of 1973, the plant utilities engineer prepared an appropriation request for an engineering study to design "a facility to eliminate contaminated waste waters flowing from Davidson property...." (DX 31, *see also* Tr. 322). The request also stated that Davidson would "continue to dump untreated waste water on ground until best solution to problem is determined." (sic) (DX 31). A memorandum sent by plant management to higher management accompanying the request stated that "continued flow of water in this area will expose us to environmental complaints." (DX 32). Action on the request

was delayed as a result of the energy crisis. (Tr. 207–09, 343, DX 37).

Richard Birch, corporate environmental analyst, conducted a field inspection of the plant and produced a report dated April 17, 1974, to the plant general manager, chief engineer, and others describing the north end discharge:

The drains from all c/p [crash pad] wash lines are piped into the building roof leaders which discharge on the surface at the north end of the plant beside the railroad siding. The water is impounded briefly, where suspended PVA agglomerates and floats to the surface, creating a foul waste with very poor visual characteristics, being milky in appearance and leaving any grass and shrubbery in its path blackened and dead. This water then courses along the track northward onto adjoining property where it again impounds and leaches away.... The community problems that would be raised by general knowledge of such a waste stream and the concomitant poor publicity resulting certainly behoove us to take immediate action to control this condition.

(DX 33, at 1–2, *see also* Tr. 483). The utilities engineer considered the discharge to be contaminated. (Tr. 483–84). When a new production line was added as of April 17, 1974, the plant utilities engineer estimated that it would result in "[c]ontinuous discharge of contaminated water (nature and degree of contamination unknown)" at a rate of 4800 to 19,200 gallons per day, as well as "[b]atch discharge of highly contaminated water containing approximately 160 pounds of fatty, metal[l]ic soap as well as foam grindings and bits" at a rate of 800 gallons per day or less. (DX 34, *see also* Tr. 484–86).

The problems continued unabated. By May 10, 1974, the plant utilities engineer had compiled a list describing the contaminants present in the north end discharge, including methylene chloride and paint solids. (DX 35). The chief plant engineer submitted a report to the general plant manager dated May 15, 1974, renewing his appropriation request. The report ac-

knowledged persistent pollution problems, including "serious pollution" in the Poka-moonshine Brook and waste water discharged to the north end that migrated to adjacent property. (DX 37). The chief engineer was concerned that Davidson would be subject to claims from its neighbor for pollution of his land. (Tr. 375).

The north end discharges continued for more than a year after the chief engineer's report. (Tr. 374–75). Finally, an appropriation request was approved and Davidson again retained Environmental Engineers, Inc. to prepare a report. In a report dated July 26, 1974, Davidson's consultants outlined five alternatives. (Tr. 377). According to the report,

> From a purely environmental standpoint, the best solution to the handling of the wastewater being discharged to the north end of the Davidson Rubber Company plant is to treat it and reuse the effluent.

(DX 42, at 4, *see also* Tr. 377–78). By contrast, the most "economical" approach, according to the report, was the installation of "percolating lagoons." (DX 42). With respect to the lagoons, the report specifically noted:

> This ground disposal option does not preclude the possibilities of occasional odors and possible contamination of the groundwater which must be evaluated.

(DX 42). The report also noted that the Davidson site was "made up of a granular soil with high permeability." (DX 42, at 5, *see also* Tr. 464). Nevertheless, Davidson management selected the lagoon system to resolve its contamination problem. In effect, the same contaminants that had been rerouted from the Pokamoonshine Brook tributary to the north end were now rerouted again to the lagoons. (Tr. 374).

The New Hampshire Water Supply and Pollution Control Commission accepted Davidson's proposal for percolating lagoons with qualifications. (PX 110). The State advised Davidson that "the recommended method of disposal is acceptable provided that no threat to surface or groundwater quality, nuisance conditions or health hazards result therefrom." (PX 110, *see also* Tr. 380–81). Even though Davidson knew the lagoons might contaminate the groundwater, it installed them anyway.

Two lagoons were installed in the mid-1970s, and a third was added later (Tr. 461–62). The purpose of the lagoons was to take waste water from the manufacturing processes and filter it into the ground. (DX 42). The lagoons were lined with sand. Samples taken in 1982 of the waste water that was discharged into the lagoons show that it contained xylene, toluene, MEK, methyl isobutyl ketone, and methylene chloride. (DX 60).

In addition to the actions and statements showing policyholders' expectation of the resulting damage described above, employees testified that they understood the consequences of Davidson's disposal practices. The plant utilities engineer admitted that Davidson was aware that there were subsurface waters and aquifers under the plant property and that his "common sense" knowledge told him that if chemicals from Davidson's operations got into the water supply, it would be contaminated. (Tr. 471–73). The chief engineer understood that all plant effluent was discharged to a septic system or directly into the ground. (Tr. 366). Coleman Hogan, President of Davidson from 1961 to 1965 and Chairman and Chief Executive Officer of McCord from 1965 to 1982, testified that he was unaware of the operation of the plant as described above. If aware of these facts, Hogan testified that he would have expected damage to the environment as a result. (Tr. 230–31).

I find that insurers proved that policyholders expected the resulting damage. Under the *Allstate* test, evidence of intent may be presumed in certain cases that involve intentional acts that can only result in damage. 432 Mich. at 719, 443 N.W.2d 734. Policyholders' actions are therefore relevant to determine their subjective expectations. Insurers have presented substantial evidence that policyholders expected their intentional acts of waste disposal to the Pokamoonshine Brook tributary, to the north end of the plant site, and to the

lagoon system would result in property damage. In light of this proof, policyholders' denial of expectation or intent flies in the face of common sense. *Id.* at 720, 443 N.W.2d 734.

### 2. *Cardinal Landfill Site*

■ Insurers do not dispute that property damage occurred at the Cardinal site during the policy periods as a result of policyholders' waste materials. The parties dispute whether that property damage was expected or intended from the standpoint of the policyholders. I find that policyholders expected the resulting damage at the Cardinal site. *Allstate,* 432 Mich. at 719–20, 443 N.W.2d 734.

During Davidson's first year of operations at the Farmington plant in 1966, it disposed of its wastes at the Farmington town dump. (Tr. 711–13). Local citizens complained of dense smoke and odors caused by the burning of Davidson's chemical waste. (Tr. 711–13, PX 25–27). Davidson asked Ernest Cardinal, who had been hauling its waste to the town dump, to operate a dump exclusively for Davidson. (Cardinal Dep.Tr., Vol. I, at 17, 186–87). Cardinal had operated a gravel pit adjacent to the town dump for approximately five years; this land now became the Cardinal landfill. (PX 24, Cardinal Dep.Tr., Vol. II, at 212–13).

Davidson sent paint solvents and methylene chloride among other chemical wastes to the Cardinal landfill. (Tr. 525–28, 532–35, 599–604, 670–71, PX 72). In December 1978, Davidson stopped that practice. From 1979 until 1981, only solid waste and methylene chloride still bottoms, which were in a semi-solid form, were sent to the landfill. (PX 185).

Policyholders contend that they did not expect or intend property damage at the Cardinal landfill site. They assert that they did not have control or knowledge over the Cardinal landfill and that the State and town knew of its operation and permitted it to continue. Policyholders also contend that Davidson waste was hauled to the Cardinal landfill by independent haulers. Employees of Davidson testified that they did not expect or intend property dam-age to result at the Cardinal landfill. (Tr. 467, 738–39).

The weight of the evidence, however, is otherwise. It shows that policyholders did expect that property damage would result. *Allstate,* 432 Mich. at 719–20, 443 N.W.2d 734. Davidson sent chemical wastes off-site for disposal at Cardinal, in part, to prevent further contamination of the Farmington plant site. From Davidson's experience of contamination at the plant site with the same chemicals, it knew that this method of disposal would have the potential to similarly contaminate the Cardinal site. (Tr. 604–07). I find that policyholders expected the resulting damage.

Davidson waste was hauled by Ernest Cardinal initially and later by other independent haulers. Davidson employees, however, visited the site from time to time and had ample opportunity to observe conditions at the site. Those conditions, which were open and obvious to an observer, included sandy soil, a visible high water table, and close proximity to a river. (Tr. 992–94, 1000, 1194–95, 1478).

Davidson employees also had ample opportunity to observe the methods of chemical disposal, and at times they may have participated in the process. (Tr. 996–98, Mabey Dep.Tr. 24–25, Williams Dep.Tr., Vol. I, at 133). On a regular basis, as many as forty to fifty 55–gallon barrels containing liquid waste were sent to the Cardinal site. (Phillips Dep.Tr. 26–27, 36–39). At the plant site, Davidson employees loaded barrels, with and without lids, onto an open-body dumpster. (Tr. 996–99, Phillips Dep.Tr. 75–78). At the landfill, Ernest Cardinal would drive up an elevated embankment and unload the barrels from the truck. (Cardinal Dep.Tr., Vol. I, at 68). During this process, some lids came off the barrels, releasing the contents. (Cardinal Dep.Tr., Vol. I, at 61, 122, 156).

Davidson management was aware from their experiences at the Farmington plant site of the hazards to groundwater that their disposal practices at the Cardinal landfill presented. (Tr. 604–06). Utilities Engineer John McCormack considered it common sense that if chemicals from the

Farmington manufacturing process got into the water supply, the water supply would be contaminated. (Tr. 471–73). Harold Hill, Chemical Engineer at the Farmington plant in the 1960s and 1970s, stated that if wastes were allowed to flow onto permeable material such as soil, groundwater contamination would probably result. (Tr. 620–21, 673–74).

I hold that under the *Allstate* test, policyholders expected the resulting property damage at the Cardinal landfill site. To find otherwise would be contrary to common sense.

### 3. *Dover Landfill Site*

The factual circumstances at the Dover landfill are equivalent to those at the Cardinal landfill. Accordingly, I find that policyholders expected the damage that occurred there. *Allstate*, 432 Mich. at 719–20, 443 N.W.2d 734.

Since 1961, Davidson has operated a manufacturing plant at Dover, New Hampshire. Because the Dover plant manufactures an automobile parts line essentially similar to the parts manufactured at the Farmington plant, the chemical wastes produced are also similar. The Dover plant initially deposited all of its waste at the municipal landfill owned and operated by the City of Dover. The landfill was closed in 1979 by the State because of pollution. (Tr. 245).

Policyholders argue that they did not expect or intend property damage at the Dover landfill site. They say that they did not have control or knowledge over the site and that it was listed by the State as an approved disposal site. Policyholders also contend that Davidson waste was hauled to the Dover landfill by independent haulers.

Present and former employees of Davidson testified that they did not expect or intend property damage to result from the disposal of Davidson's waste at the Dover landfill. (Tr. 544–45, 738–39). An employee of the City of Dover responsible for the Dover landfill stated that he did not expect or intend property damage to result. (Tr. 245–47).

The evidence is to the contrary. It shows that policyholders did expect that property damage would result. *Allstate*, 432 Mich. at 719–20, 443 N.W.2d 734. Because of Davidson's experience at the Farmington plant site with the same chemicals, it knew that this method of disposal would have the potential to contaminate the Dover site. (Tr. 604–07, 673–74).

In the early 1960s, Davidson hauled its own waste to the landfill from the Dover plant until the volume became too great and an independent contractor was hired. (Tr. 1099, Demers Dep.Tr. 19–20). Davidson's liquid wastes were placed in 55-gallon barrels for transport. Some barrels had lids while others did not. (Tr. 1102–04, Gilbert Dep.Tr. 50–51). It was understood that the purpose of the lids was to control spillage during transport but that the contents would be intentionally poured out at the landfill. (Gilbert Dep.Tr. 209–10).

The environmental conditions at the Dover site were open and obvious and were known to Davidson. (Tr. 255). It is located approximately 400 feet uphill from the Cocheco River. (Tr. 248–49). It sits in a wetland area with highly permeable sandy soil; groundwater is visible at some points. (Tr. 251, 260–61, 1180, 1184–85). Raymond Bardwell, Director of Public Works for the City of Dover from 1962 to 1965, described the Dover Landfill as follows:

> I think we had a very high water table, it was very evident that you didn't have to be a hydrologist to realize that the water table was very close to the surface of the ground. And to be depositing rubbish either in water or in trenches filled with water was—I didn't—I didn't feel to be a very suitable way of handling the disposal of waste.

(Bardwell Dep.Tr. 16–18). In 1967, a trench surrounded the disposal area so that liquid would run down to the river if it did not soak into the soil. (Tr. 252, 1485).

The disposal methods at Dover were apparent and were known to Davidson. (Tr. 255, Gilbert Dep.Tr. 72–73, Littlefield Dep.Tr. 258). Dover accepted any and all waste brought to the site. (Tr. 271–72). Albert Guay, who ran the landfill from

1961 to 1978, stated that when Davidson's waste arrived, the driver would dump it off the truck or empty the barrels by hand. Davidson disposed of three to six loads per day. (Guay Dep.Tr. 11–13). Guay described the procedure for dumping liquid waste:

> Well, I'd dig a hole about 10, 15 feet deep. Then they'd dump in there, and every night I used to cover it up with material, you know, gravel and sand, whatever, in case of fire.

(Guay Dep.Tr. 19). The liquid from the barrels seeped into the holes and sometimes directly into water. (Tr. 259–60, 1103, 1189, PX 187). Some of Davidson's chemical waste self-ignited. Pierre Bouchard, Superintendent of Public Works and Water for the City of Dover from 1968 to 1974, asked the city fire chief to tell Davidson to correct the problem. (Tr. 256–57).

Davidson management was aware that landfills such as Dover presented hazards to groundwater contamination. (Tr. 604–07, 673–74). In the early 1970s, State officials were concerned that dumping wastes into the water at the Dover site posed a threat to groundwater contamination. (Tr. 265–67). City residents questioned contamination from the landfill. An editorial in the local paper identified the need for a more environmentally-sound dump site as a community priority. (Tr. 1488, DX 203).

Policyholders' actions demonstrate that it expected the resulting property damage at the Dover landfill site. In light of the evidence, I hold that insurers are not obligated to indemnify policyholders as to the Dover site.

#### 4. *Ottati & Goss Site*

■ Policyholders bear the burden of proving an "occurrence" during each policy period for which they seek coverage from each insurance company. *Fireman's Fund Insurance Co.*, 662 F.Supp. at 76. I find as to the Ottati & Goss site that policyholders did not meet that burden.

Davidson sent some of its used 55–gallon drums for cleaning and repainting to the Ottati & Goss site from the mid–1960s to 1976. (PX 199). Policyholders argue that the drums it sent contained chemical residues consistent with the type of contamination identified at the Ottati & Goss site. (Tr. 946–48, 1150, 1222–24).

Although policyholder documents show that "empty drums" were sent by Davidson to Ottati & Goss, they produced no probative evidence of what materials were sent and in what quantities. Further, they produced no evidence to show that any contaminants generated or transported by policyholders ever came into contact with the environment at that site. (Tr. 1149–51, 1223, PX 199). The only witnesses to testify regarding the Ottati & Goss site were policyholders' experts, Donald Corey and Daniel Morrissey. Mr. Corey and Mr. Morrissey, however, have never visited the site while it was in operation, and I find their testimony as to the Ottati & Goss site lacks credibility. (Tr. 1152). I hold that policyholders have not proved an occurrence that resulted in property damage at the Ottati & Goss site.

#### C. Duty to Defend

Previously, I held that insurers have a duty to defend policyholders in the underlying actions.[15] *Fireman's Fund Insurance Co.*, 662 F.Supp. 71. Because the duty to defend and the duty to indemnify are separate contractual obligations, I am of the tentative opinion that insurers' duty to defend continues until the underlying actions are resolved.

Michigan case law holds that the duty to defend and the duty to indemnify are separate contracts. *Stockdale v. Jamison*, 416 Mich. 217, 225, 330 N.W.2d 389, 392 (1982); *State Farm Fire and Casualty Co. v. Huyghe*, 144 Mich.App. 341, 345, 375 N.W.2d 442, 443 (1985). When policyholders contract with insurers for insurance coverage they expect to receive the benefits of their bargain, part of which is insurers' duty to defend policyholders against all claims. The duty to defend is broader than the duty to indemnify. *Iacobelli Construction Co. v. Western Casualty & Surety Co.*, 130 Mich.App. 255, 261, 343

---

**15.** The matter of defense costs has been assigned to a Magistrate.

N.W.2d 517, 520 (1983). That duty continues in this case until the underlying claims between EPA, the State agency, and policyholders are resolved. *Ray Industries*, 728 F.Supp. at 1320.

This court is aware that case law exists to support the contrary result. *See, e.g., Bundy Tubing Co. v. Royal Indemnity Co.*, 298 F.2d 151, 154 (6th Cir.1962); *Lee v. Aetna Casualty & Surety Co.*, 178 F.2d 750, 753 (2d Cir.1949); *Detroit Edison Co. v. Michigan Mutual Insurance Co.*, 102 Mich.App. 136, 142, 301 N.W.2d 832, 835 (1980).

There is no language in the general comprehensive liability policy issued by the insurers in this case that states that the obligation to defend an insured terminates when it is determined that there is no obligation to indemnify the insured. The cases above that so hold do not deal with contract interpretation. They simply assume, apparently, that if there is no coverage, there is no duty to defend. If such were the intention of the parties, it would have been simple to insert such clarifying language into the insurance contract.

Since this issue was not taken up at trial, I invite counsel to furnish briefs on this issue within ten (10) days of the receipt of this opinion, and I will thereupon rule.

V. *Conclusions of Law*

For the foregoing reasons, I hold that insurers do not have a duty to indemnify policyholders under the insurance contracts at issue. Accordingly, I find that policyholders are not entitled to a declaration that Wausau, American Employers, First State, and New England are obligated to indemnify policyholders for all sums that policyholders are obligated to pay to clean up groundwater contamination at the Farmington, Cardinal, Dover, and Ottati & Goss sites. Wausau's motion for summary judgment on the issue of "damages" and First State's motion from reformation or rescission are moot.

IT IS SO ORDERED.

## ADDENDUM TO MEMORANDUM OPINION AND ORDER

Under a procedure determined at trial, any exhibit not objected to would be received into evidence and any objections to exhibits would be made in writing. Policyholders objected to three exhibits which were cited in the Memorandum Opinion and Order of August 30, 1990. I now address and rule on those objections.

First, policyholders objected to DX 60 and DX 156 on the ground that they are irrelevant to policyholders' expectation or intent to cause groundwater contamination during the policy periods at issue. I agree with policyholders that DX 60 and DX 156 are irrelevant for that purpose. I cited those exhibits, however, for an entirely different purpose. The exhibits support the proposition that policyholders did not carry their burden of proving an occurrence at the Farmington Plant site because it is just as likely that contamination occurred after the expiration of the last policy period.

Defendants' Exhibit 60 is a Davidson inter-office memorandum dated October 11, 1982, from T.M. Filipiak to H. Greenlaw. It discusses the impact of Davidson's manufacturing process on area groundwater in 1982. Defendants' Exhibit 156 is another internal memorandum dated May 29, 1984, from H. Greenlaw to H. Williams. That memorandum lists sources of discharge that the author notes are potential groundwater disposal problems.

In section IV.(B)(1)(a) of the Opinion, I cite these memoranda to support policyholders' failure to prove an occurrence at the Farmington Plant site. Policyholders' theory was that a storage tank spill and a pipe rupture caused the groundwater contamination. Policyholders failed to affirmatively support this theory. Furthermore, evidence presented at trial supports the possibility that contamination may have occurred after the policies at issue expired. It was in support of this possibility that I cited DX 60 and DX 156.

Even if I somehow erred in admitting DX 60 and DX 156, it was harmless error. These two exhibits were a relatively minor part of a substantial body of evidence

presented at trial. The ruling in this case rested on myriad evidence other than DX 60 and DX 156.

Second, policyholders objected to DX 203 as an unauthenticated document that is hearsay. Defendants' Exhibit 203 is a newspaper editorial from *Foster's Daily Democrat* which discusses the Dover landfill. I cited it in the Opinion in section IV.(B)(3) as evidence that the local community was aware that a more environmentally-sound landfill was necessary. It supports the position that awareness of groundwater contamination was fairly widespread in the community.

Defendants' Exhibit 203 was introduced during the testimony of insurers' expert Frank Rovers. After voir dire by counsel for policyholders, I ruled that policyholders' objection to DX 203 should go to its weight, not its admissibility. (Tr. 1488–89). I did not cite DX 203 in the Opinion to imply that because of the editorial, policyholders expected or intended contamination at the Dover landfill site. Trial testimony indicates that Davidson management was aware that landfills such as Dover presented hazards to groundwater contamination, irrespective of what anyone else knew. Defendants' Exhibit 203 is merely cited to show that the potential for groundwater contamination from landfills was known to at least certain segments of the Dover community. Even if I erred in admitting DX 203, it was harmless error because the exhibit was not necessary to my decision.