OUTBOARD MARINE CORPORATION, Plaintiff-Appellee, v. LIBERTY MUTUAL INSURANCE COMPANY, Defendant-Appellant (Commercial Union Insurance Company *et al.*, Defendants).—OUTBOARD MARINE CORPORATION, Plaintiff-Appellant, v. LIBERTY MUTUAL INSURANCE COMPANY *et al.*, Defendants-Appellees.

Second District Nos. 2—90—0349, 2—90—0399 cons.

Opinion filed January 31, 1991.—Rehearing denied March 11, 1991.

Jeffrey L. Kaser, Rivkin, Radler, Bayh, Hart & Kremer, of Chicago (Jay V. Krafsur, of counsel), for Commercial Union Insurance Company.

Paul S. Chervin and Daniel P. Felix, both of Wildman, Harrold, Allen & Dixon, of Waukegan, and Kim Marrkand, Anthony A. Bongiorno, Jeffrey W. Kobrick, and Jennifer Lauro, all of Gaston & Snow, of Boston, Massachusetts (James P. Whitters III, of counsel), for Liberty Mutual Insurance Company.

Margaret J. Orbon, of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, and John L. Altieri, Jr., and Aaron F. Fishbein, both of Mudge, Rose, Guthrie, Alexander & Ferdon, of New York, New York (Paul R. Koepff, of counsel), for Insurance Company of North America.

Marsha K. Ross, Mary Beth Denefe, and Audrey S. Hanrahan, all of Haskell & Perrin, of Chicago, and Gary S. Kull, of McElroy, Deutsch & Mulvaney, of Morristown, New Jersey (Lorraine M. Armenti, of counsel), for International Insurance Company.

Leslie A. Peterson, of Brydges, Riseborough, Morris, Franke & Miller, and Lonchar & Nordigian, both of Waukegan, and Michael G. Erner and Michael R. Adele, both of Irell & Manella, of Newport Beach, California (Louis W. Brydges, Sr., and Thomas W. Johnson, Jr., of counsel), for Outboard Marine Corporation.

Nancy J. Gleason, Philip McGuire, Charles L. Philbrick, and Brian Frankel, all of Dowd & Dowd, Ltd., of Chicago, for Northbrook Insurance Company.

Terry R. Saunders, of Susman, Saunders & Buehler, of Chicago, and Thomas W. Brunner, James M. Johnstone, and Frederick S. Ansell, all of Wiley, Rein & Fielding, of Washington, D.C., for *amicus curiae* Insurance Environmental Litigation Association.

Martha Churchill, of Mid-America Legal Foundation, and Eugene R. Anderson, Michael R. Magaril, Teresita Rodriguez, and Lester O. Brown, all of Anderson, Kill, Olick & Oshinsky, P.C., of New York, New York, for *amicus curiae* Mid-America Legal Foundation.

Kevin M. Forde and Katrina Veerhusen, both of Kevin M. Forde, Ltd., of Chicago, and James T. Price, Stephanie A. Mathews, and Thomas J. Wilcox, all of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, for *amicus curiae* Illinois Manufacturers Association.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, Outboard Marine Corporation (OMC), filed a declaratory judgment action against several insurance companies which had issued it comprehensive general liability (CGL) policies. OMC alleged that the companies breached their duty to defend it against lawsuits filed by the United States Environmental Protection Agency (USEPA) and the State of Illinois which asserted that OMC was responsible for high levels of PCB's in Lake Michigan, one of its tributaries known as the North Ditch, and Waukegan Harbor. Liberty Mutual Insurance Company (Liberty Mutual) appeals from orders of the circuit court denying its motion for summary judgment and granting partial summary judgment to OMC. The issue in this appeal is whether there was coverage under a policy provision providing coverage for any suit against OMC seeking damages on account of property damage when the primary relief sought in the USEPA and State of Illinois actions was injunctive relief.

The above appeal has been consolidated with a subsequent appeal by OMC from orders granting summary judgment to defendants, Commercial Union Insurance Company (Commercial Union), Insurance Company of North America (INA), International Insurance Company (International), and Northbrook Insurance Company (Northbrook), and granting partial summary judgment to Liberty Mutual. The primary issue in this appeal is whether the circuit court was correct in determining that a pollution exclusion clause in the applicable policies precluded coverage even though the exclusion did not apply by its own terms to OMC discharges which were "sudden and accidental." Commercial Union and INA also argue that granting them summary judgment was appropriate because at the times their policies were issued to OMC, OMC already knew there was a substantial risk it would be held liable for causing pollution in the bodies of water in question. OMC argues that the defendant insurance companies are

estopped from denying coverage because they did not seek a declaratory judgment that there was no coverage or provide OMC with a defense under a reservation of rights. In both appeals, we affirm the circuit court's orders.

We will first set forth the facts relevant to the Liberty Mutual appeal and consider the merits of that appeal. The USEPA filed its initial complaint against OMC in the United States District Court for the Northern District of Illinois on March 17, 1978. The complaint alleged that OMC discharged process and storm water from its Waukegan facility into Lake Michigan, Waukegan Harbor, and the North Ditch. From 1959 until 1972, OMC used a hydraulic fluid composed of polychlorinated biphenyl (PCB), which are highly toxic chemical mixtures that are resistant to heat and flames. Large portions of the leaks and spills incident to the use of these chemicals were routed to OMC's wastewater collection system. The effluent from OMC's facility therefore carried large amounts of PCB's into Waukegan Harbor and the North Ditch, resulting in the extreme contamination of the bottom sediments of these bodies of water. In some areas, 25% of these sediments were comprised of PCB's.

The USEPA further alleged in its complaint that, while it had issued OMC a permit to discharge certain pollutants in limited quantities into the lake and its tributaries, the permit did not authorize OMC to discharge PCB. OMC's actions therefore violated the Rivers and Harbors Act of 1899 (33 U.S.C. §407 (1988)) and section 301(a) of the Federal Water Pollution Control Act (FWPCA) (33 U.S.C. §1311(a) (1988)). The USEPA sought an order enjoining OMC from further contamination of Lake Michigan, Waukegan Harbor and the North Ditch, and requiring OMC to dredge the contaminated sediments of the North Ditch as expeditiously as possible. It also sought an order requiring OMC to undertake an expedited study of the safest way of removing and disposing of the contaminated sediments of Waukegan Harbor and then to conduct the removal and disposal of the sediments. Furthermore, the USEPA sought the assessment of a civil penalty against OMC in the amount of $10,000 for each day after October 18, 1972, that it discharged PCB's, and it also sought the costs of the action.

The State of Illinois filed its complaint against OMC in the United States District Court for the Northern District of Illinois on August 10, 1978. The State's complaint contained basically the same factual allegations against OMC as did the USEPA complaint. The State's complaint alleged violations of the FWPCA, the Illinois public nuisance act (Ill. Rev. Stat. 1977, ch. 100½, par. 1 et seq.), the Illinois

Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1001 *et seq.*), the Federal and State common law of nuisance, and the Illinois common law of trespass. The following relief was sought by the State: (1) an injunction restraining OMC from discharging PCB's from its Waukegan facility, (2) an order directing OMC to undertake a study of methods of dredging, removing, and disposing of the PCB contaminated sediments, (3) an order requiring OMC to remove and dispose of the contaminated sediments, (4) an order requiring OMC to dispose PCB-contaminated soils on its own land, (5) a civil penalty of $10,000 per day for each day OMC discharged PCB's in violation of the FWPCA after October 18, 1972, and (6) a civil penalty of $10,000 for each violation of the Illinois Environmental Protection Act and $1,000 per day for each day after July 1, 1970, that the violations continued.

OMC filed a third-party complaint in the USEPA action against Monsanto Company, alleging that Monsanto had manufactured Pydraul, a hydraulic fluid containing PCB's. OMC had used Pydraul in the process of manufacturing outboard motors. On July 22, 1980, the USEPA amended its complaint by adding allegations against Monsanto. Monsanto subsequently filed a cross-claim against OMC in which it sought contribution in the USEPA action and reimbursement of all expenses incurred as a result of that action.

On January 22, 1982, the USEPA filed a second amended complaint in which it added a claim against OMC pursuant to section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §9606(a) (1988)). In addition to the relief sought in its prior complaint, the USEPA sought the issuance of orders directing OMC and Monsanto to construct expeditiously a bypass of the North Ditch which would collect and reroute effluent flows away from the ditch and into Lake Michigan by means of an alternative piping system and to install and operate groundwater purge wells and an accompanying water treatment system designed to remove PCB's from groundwater underneath OMC property.

The district court dismissed the above actions without prejudice on February 6, 1985, at the request of the USEPA. The USEPA and State of Illinois retained the right to seek response costs under section 107(a) of CERCLA (42 U.S.C. §9607(a) (1988)). On October 7, 1988, the United States filed a new complaint against OMC in the United States District Court for the Northern District of Illinois. The factual allegations were very similar to those in the 1978 USEPA complaint. The State of Illinois filed a new complaint with similar allegations against OMC that same day. Both 1988 complaints sought re-

sponse costs and damages resulting from injuries to natural resources resulting from OMC's discharges of PCB's. This relief was sought pursuant to section 107 of CERCLA (42 U.S.C. §9607 (1988)). OMC entered into a consent decree with the State of Illinois and United States which the court approved on April 27, 1989. Under the terms of the decree, OMC was required to make payments into a trust fund for the cleanup of Lake Michigan, Waukegan Harbor, and the North Ditch.

OMC filed its complaint for declaratory judgment on August 15, 1986, alleging that Liberty Mutual and the other defendants had a duty to defend it in the underlying actions filed by the USEPA and the State of Illinois. OMC also alleged that its insurance carriers were liable for any sums which OMC was forced to pay as a result of these actions.

The CGL policies issued to OMC by Liberty Mutual provided in relevant part that the insurer

> "will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of *** bodily injury or property damage to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury or property damage ***."

On June 29, 1987, OMC filed a motion for partial summary judgment in which it alleged the underlying actions were suits for damages within the meaning of the Liberty Mutual policies and policies issued by other defendants. Defendants subsequently filed cross-motions for summary judgment in which they argued to the contrary. On January 16, 1990, the trial court issued an order denying defendants' motions and granting OMC's motion for summary judgment. On March 19, 1990, the trial court entered an order pursuant to Supreme Court Rule 308 (107 Ill. 2d R. 308), certifying for immediate appeal the question of whether the underlying USEPA and State of Illinois suits were suits seeking damages under defendants' CGL policies. This court granted Liberty Mutual leave to appeal on April 24, 1990, but denied two other defendants leave to appeal because they had been granted summary judgment on a different basis, the applicability of their pollution exclusion provisions.

■ Ambiguous terms in an insurance policy will be construed in favor of the insured. (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 4; *West American Insurance Co. v. Vago* (1990), 197 Ill. App. 3d 131, 137.) Liberty Mutual argues that no ambiguity exists here; the applicable policy provision only renders it lia-

ble for sums OMC "is obligated to pay as damages" and only requires it to defend OMC against lawsuits in which damages are sought. Therefore, since the USEPA and the State of Illinois sought injunctive relief and civil penalties in their original lawsuits, there was no duty to defend or indemnify.

■ OMC argues that the term "damages" is ambiguous to a lay person without legal training. Since the existence of an ambiguity in an insurance policy depends upon how an ordinary person would understand a policy term rather than a person with legal training (*United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 391), OMC argues that the term "damages" in the policy provision at issue here is ambiguous and should be construed as providing coverage. The trial judge relied largely upon the *Specialty Coatings* opinion in accepting OMC's argument.

In *Specialty Coatings*, plaintiff issued defendant an insurance policy which stated that plaintiff would provide a defense for all suits against the insured "seeking damages on account of *** property damage." One of the issues was whether this policy language provided coverage for actions seeking injunctive relief, civil penalties and response costs pursuant to CERCLA and the Illinois Environmental Protection Act because of activities by defendant which caused land and water pollution. The court concluded that there was coverage under this provision, determining that while the word "damages" may have an accepted, technical meaning in the legal community, the term is ambiguous to others. (*Specialty Coatings*, 180 Ill. App. 3d at 391.) The court went on to state that an insured should be able to rely upon a commonsense expectation that property damage within the meaning of the policy would include claims causing him or her to pay money to others whose rights were affected adversely by the insured's acts or omissions. (180 Ill. App. 3d at 392.) The court further stated that while claims under CERCLA and other environmental statutes could be characterized as actions seeking equitable relief, cleanup costs are essentially compensatory damage for injury done to common property; therefore, the insurer has a duty to defend. 180 Ill. App. 3d at 392.

Due to the passage of CERCLA in 1980 and the prevalence of the language we are presently considering in CGL policies, the issue of whether lawsuits for injunctive relief and cleanup costs under CERCLA and other environmental statutes are actions for damages which the insurer must defend and for which it may be held liable has been litigated nationwide. Most State courts considering the issue have concluded, as the court did in *Specialty Coatings*, that coverage exists because such lawsuits are actions seeking damages. (See, *e.g.*, *AIU In-*

*surance Co. v. Superior Court* (1990), 51 Cal. 3d 807, 819-20, 846, 799 P.2d 1253, 1262-63, 1279, 274 Cal. Rptr. 820, 829-30, 841-42; *Hazen Paper Co. v. United States Fidelity & Guaranty Co.* (1990), 407 Mass. 689, 701, 555 N.E.2d 576, 583; *Upjohn Co. v. New Hampshire Insurance Co.* (1989), 178 Mich. App. 706, 719, 444 N.W.2d 813, 819; *Minnesota Mining & Manufacturing Co. v. Travelers Indemnity Co.* (Minn. 1990), 457 N.W.2d 175, 183; *C.D. Spangler Construction Co. v. Industrial Crankshaft & Engineering Co.* (1990), 326 N.C. 133, 153, 388 S.E.2d 557, 569; *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co. of New York* (1987), 218 N.J. Super. 516, 527, 528 A.2d 76, 82; *Boeing Co. v. Aetna Casualty & Surety Co.* (1990), 113 Wash. 2d 869, 888, 784 P.2d 507, 516. Contra *Patrons Oxford Mutual Insurance Co. v. Marois* (Me. 1990), 573 A.2d 16, 19-20.

Federal courts considering this issue have been divided. In several cases, the courts have concluded that policy language similar to that in the case at bar is not ambiguous and does not provide coverage for actions under CERCLA and other environmental statutes for cleanup costs and injunctive relief. (See, *e.g., Cincinnati Insurance Co. v. Milliken & Co.* (4th Cir. 1988), 857 F.2d 979, 981; *Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co.* (8th Cir. 1988), 842 F.2d 977, 986-87; *Maryland Casualty Co. v. Armco, Inc.* (4th Cir. 1987), 822 F.2d 1348, 1352.) Other Federal courts have reached the contrary conclusion, in accord with a majority of State courts. See, *e.g., Avondale Industries, Inc. v. Travelers Indemnity Co.* (2d Cir. 1989), 887 F.2d 1200, 1207; *United States Fidelity & Guaranty Co. v. Thomas Solvent Co.* (W.D. Mich. 1988), 683 F. Supp. 1139, 1168; *New Castle County v. Hartford Accident & Indemnity Co.* (D. Del. 1987), 673 F. Supp. 1359, 1366.

■ The court pointed out in *Specialty Coatings* (180 Ill. App. 3d at 391-92) that one dictionary contains the following definitions of "damages":

> "[T]he estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." (Webster's Third New International Dictionary 581 (3d ed. 1981).)

As the court stated in *Specialty Coatings*, these definitions are broader than the narrow, legal definition advanced by the insurer. (180 Ill. App. 3d at 391.) We agree with the conclusion reached in *Specialty Coatings* and by other courts that the term "damages" in the policy provision at issue is ambiguous and must therefore be construed in a manner favorable to the insured. 180 Ill. App. 3d at 392; see also *Minnesota Mining & Manufacturing Co.*, 457 N.W.2d at 181;

*C.D. Spangler Construction Co.*, 326 N.C. at 143, 388 S.E.2d at 563; *Boeing Co.*, 113 Wash. 2d at 875, 784 P.2d at 510.

Furthermore, as the California Supreme Court has recently pointed out, this ambiguity is exacerbated by environmental statutory schemes such as CERCLA which by their operation tend to remove the formal distinction between payment of compensation to an aggrieved party and the expenditure of money under the compulsion of a mandatory injunction. In *AIU Insurance Co.*, the court held that a governmental suit for response costs under CERCLA, which is a suit to recover expenditures made by the government if it cleans up a contaminated site (see 42 U.S.C. §9607 (1988)), is an action for damages within the meaning of the policy language in question. (*AIU Insurance Co.*, 51 Cal. 3d at 819-20, 799 P.2d at 1262-63, 274 Cal. Rptr. at 829-30.) The court noted that Federal agencies that would seek response costs are charged with the duty of removing hazardous waste from any property, even if the government has no ownership interest in the property. (*AIU Insurance Co.*, 51 Cal. 3d at 828, 799 P.2d at 1269, 274 Cal. Rptr. at 836.) Therefore, when these agencies seek response costs, they do so on the basis of fiscal harm to the public, which constitutes loss or detriment; the response costs are monetary compensation for that loss or detriment. (*AIU Insurance Co.*, 51 Cal. 3d at 828, 799 P.2d at 1269, 274 Cal. Rptr. at 836.) Therefore, the court felt that response costs fit within the accepted meaning of "damages," compensation for a loss sustained by another.

In so holding, the court rejected an argument that we likewise find unpersuasive. Liberty Mutual argues that reimbursement of response costs under CERCLA is analogous to government-imposed costs of doing business such as compliance with OSHA regulations and fire and building codes, none of which are covered by CGL policies. Rejecting a similar argument in *AIU*, the court pointed out that response costs are compensation for losses sustained by the government for cleaning up land or water (*AIU Insurance Co.*, 51 Cal. 3d at 832, 799 P.2d at 1272, 274 Cal. Rptr. at 839) and are not merely costs incurred as the result of prophylactic safety or health measures required by statute. We agree with the *AIU* court's analysis.

In the case at bar, the USEPA and the State of Illinois did not seek response costs until they filed their 1988 complaints. In their previous complaints, the State and the USEPA sought mandatory injunctions compelling OMC to conduct studies concerning cleanup of the PCB contamination and then compelling OMC to undertake the cleanup. In *AIU*, the court considered whether actions for injunctive

relief under CERCLA were actions for damages within the meaning of the policy provision here.

In considering this issue, the court noted that in *Aetna Casualty & Surety Co. v. Hanna* (5th Cir. 1955), 224 F.2d 499, 503, the court held that the cost of complying with an injunction was not covered by a CGL policy with a similar coverage clause. The Illinois Appellate Court for the Third District reached the same conclusion in *Ladd Construction Co. v. Insurance Co. of North America* (1979), 73 Ill. App. 3d 43, 47-48. It is noteworthy, however, that neither *Hanna* nor *Ladd* involved actions for injunctive relief under environmental statutes such as CERCLA and the FWPCA.

■ As the court pointed out in *AIU*, the interplay of legal and equitable remedies in tort actions such as those in *Hanna* and *Ladd* is different from the relationship between the remedies authorized by CERCLA. (*AIU Insurance Co.*, 51 Cal. 3d at 843, 799 P.2d at 1276, 274 Cal. Rptr. at 838-39.) Normally, injunctive relief is only available if there is no adequate remedy at law. (*Shodeen v. Chicago Title & Trust Co.* (1987), 162 Ill. App. 3d 667, 672.) Injunctive relief under section 106 of CERCLA, however, was intended to be a viable alternative to recovery of response costs under section 107 after cleanup by a governmental agency regardless of the adequacy of the latter remedy. (See 42 U.S.C. §§9606, 9607 (1988); *AIU Insurance Co.*, 51 Cal. 3d at 839, 799 P.2d at 1277, 274 Cal. Rptr. at 844; *United States v. Price* (D.N.J. 1983), 577 F. Supp. 1103, 1112.) Thus, the court in *AIU* determined that "it would exalt form over substance to interpret CGL policies to cover one remedy but not the other." *AIU Insurance Co.*, 51 Cal. 3d at 839, 799 P.2d at 1277, 274 Cal. Rptr. at 844.

■ We agree with this conclusion. In the context of CERCLA, mandatory injunctive relief involves the same type of expenditures as reimbursement of response costs. (*AIU Insurance Co.*, 51 Cal. 3d at 839, 799 P.2d at 1277-78, 274 Cal. Rptr. at 845.) Thus, considering the basic similarity of injunctive relief and reimbursement of response costs under CERCLA and other environmental statutes, an ordinary individual would expect both remedies to fall within the ambit of coverage as "damages." (*AIU Insurance Co.*, 51 Cal. 3d at 839, 799 P.2d at 1277-78, 274 Cal. Rptr. at 845; *Minnesota Mining & Manufacturing Co.*, 457 N.W.2d at 181-82.) Furthermore, the utility of a CGL policy would be highly dubious if coverage were allowed to hinge upon whether plaintiff's complaint was framed in equity rather than law under circumstances such as these. *Minnesota Mining & Manufacturing Co.*, 457 N.W.2d at 181; see also *United States Aviex Co. v. Trav-*

*elers Insurance Co.* (1983), 125 Mich. App. 579, 589, 336 N.W.2d 838, 843.

 Public policy concerns also dictate this result. As we have previously indicated, Congress, in enacting CERCLA, intended to provide the EPA and other agencies charged with responsibilities for environmental cleanup efforts with flexibility in choosing remedies. This flexibility would be compromised if policy provisions such as those at issue here were construed as providing coverage for reimbursement of response costs but not the costs of complying with mandatory injunctions to clean contaminated sites. Additionally, at least one court has recognized the importance of securing the cooperation of potentially responsible parties in environmental cleanup efforts and the practical difficulties that would be involved if the USEPA was forced to expend the necessary funds for cleanup in most instances and recoup the funds under the response costs provisions of CERCLA (42 U.S.C. §9607 (1988)) rather than seek injunctions requiring the responsible parties to undertake cleanup efforts. (See *Intel Corp. v. Hartford Accident & Indemnity Co.* (N.D. Cal. 1988), 692 F. Supp. 1171, 1193.) The prospect of cooperation from responsible parties would be significantly reduced if the insurer's contributions were contingent upon a governmental cleanup, followed by a lawsuit to recover response costs, followed by a claim against the insurer, rather than cleanup by or with the cooperation of the responsible party. (*Intel Corp.*, 692 F. Supp. at 1193.) Clearly, it is better from a public policy standpoint to encourage responsible parties to take expeditious action to mitigate and remedy groundwater contamination and other forms of pollution rather than wait for a government-operated cleanup effort. *Minnesota Mining & Manufacturing Co.*, 457 N.W.2d at 182.

 For the above reasons, we conclude that the underlying actions for injunctive relief under the environmental statutes in question were actions seeking damages under the meaning of the Liberty Mutual CGL policies. We therefore affirm the judgment of the circuit court of Lake County in the initial appeal.

We now turn to the appeal taken by OMC. The policies issued to OMC by INA, Commercial Union, and Northbrook, and some of the policies issued by Liberty Mutual, contained a pollution exclusion provision which stated, in relevant part, as follows:

> "This insurance does not apply *** to bodily injury or property damage arising out of the discharge, dispersal, release or escape of *** contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this ex-

clusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

INA, Commercial Union, and Northbrook all filed motions for summary judgment in which they contended that the above exclusionary provision precluded coverage for the actions of OMC which caused the PCB contamination of Waukegan Harbor, Lake Michigan, and the North Ditch; therefore, they had no duty to defend or indemnify with regard to the USEPA or State of Illinois actions. Liberty Mutual filed a motion for partial summary judgment on the same basis with regard to those policies containing the pollution exclusion. The insurance companies argued that the exception to the exclusion could not possibly apply when the USEPA and the State of Illinois complaints alleged that the water contamination occurred over a period of over a decade and the evidence revealed this was the case. The companies argued that, under these circumstances, the discharges of PCB's into the above bodies of water by OMC could not be considered sudden under the exception to the pollution exclusion.

Central to the insurers' position is their contention that the word "sudden" has a temporal meaning and is synonymous with "abrupt." OMC disputes this contention, arguing that the word is ambiguous and should be construed as meaning "unexpected."

The meaning of the phrase "sudden and accidental" in CGL pollution exclusion clauses with the same language as the clause in this case has been considered in four Illinois cases with varying results. In three of the cases, the court concluded that the phrase "sudden and accidental" as used in the clause is ambiguous and should be construed as meaning "unintended and unexpected" since that construction is most favorable to the insured. (*United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1989), 193 Ill. App. 3d 1087, 1099; *Specialty Coatings*, 180 Ill. App. 3d at 388; *Reliance Insurance Co. v. Martin* (1984), 126 Ill. App. 3d 94, 97-98.) In the other case, the court concluded that in the context of the clause and the policy as a whole, the phrase is not ambiguous and the word "sudden" has a temporal connotation. (*International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.* (1988), 168 Ill. App. 3d 361, 378.) In *International Minerals,* the court concluded that the term "sudden" was synonymous with "abrupt." See *International Minerals,* 168 Ill. App. 3d at 378.

■■ ■ We agree with the conclusion of the court in *International Minerals* that, in the context of the pollution exclusion clause, the word "sudden" is not ambiguous and has a temporal connotation. The pollution exclusion clause states that the exclusion does not apply if a

discharge of pollutants is "sudden and accidental." In our opinion, the court in *Specialty Coatings* failed to consider the context in which the word "sudden" appears.

The general rules of contract construction apply to insurance policies. (*DeFoor v. Northbrook Excess & Surplus Insurance Co.* (1984), 128 Ill. App. 3d 929, 934.) It is presumed that words and phrases inserted into contracts were not intended to be meaningless; therefore, an interpretation which renders a contractual word or phrase mere surplusage should be avoided if possible. (*In re Estate of Savage* (1979), 73 Ill. App. 3d 656, 659.) As the court pointed out in *International Minerals*, if the term "sudden" is interpreted as meaning "unintended and unexpected," it becomes synonymous with the word "accidental," making one of the words nothing more than redundant surplusage. (*International Minerals,* 168 Ill. App. 3d at 378.) We agree with the conclusion of the court in *International Minerals* that, in this context, the word "sudden" is not ambiguous; it has a temporal meaning and is synonymous with "abrupt." We note that a number of courts in other jurisdictions have interpreted the word "sudden" in the same pollution exclusion clause as we have interpreted it. See, *e.g., Lumbermen's Mutual Casualty Co. v. Belleville Industries, Inc.* (1990), 407 Mass. 675, 680, 555 N.E.2d 568, 572; *Fireman's Fund Insurance Cos. v. Ex-Cell-O Corp.* (E.D. Mich. 1988), 702 F. Supp. 1317, 1326; *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 699, 340 S.E.2d 374, 382; *Lower Paxon Township v. United States Fidelity & Guaranty Co.* (1989), 383 Pa. Super. 558, 576, 557 A.2d 393, 402. But see, *e.g., Kipin Industries, Inc. v. American Universal Insurance Co.* (1987), 41 Ohio App. 3d 228, 231, 535 N.E.2d 334, 338; *Claussen v. Aetna Casualty & Surety Co.* (1989), 259 Ga. 333, 337, 380 S.E.2d 686, 690; *Just v. Land Reclamation, Ltd.* (1990), 155 Wis. 2d 737, 761, 456 N.W.2d 570, 579.

OMC disagrees with the above analysis from *International Minerals*. According to OMC, the word "sudden" means unexpected and "accidental" means unintended; therefore, the two words as employed in the pollution exclusion clause are not redundant surplusage if "sudden" does not include a temporal element. We agree, however, with those authorities that define "accidental" as meaning unintended *and* unexpected. (See *Fireman's Fund Insurance Cos. v. Ex-Cell-O Corp.* (E.D. Mich. 1988), 702 F. Supp. 1317, 1325; 1A Appleman, *Insurance Law and Practice* §360 at 452-53 (1981); see also *Taylor v. John Hancock Mutual Life Insurance Co.* (1957), 11 Ill. 2d 227, 230 ("accidental means" defined as something which happens without intention and

which is unexpected).) If a party expects an event to occur, the event cannot reasonably be considered accidental with reference to that party. Therefore, if "sudden" is construed as meaning unexpected and having no temporal connotation, the word is reduced to mere surplusage. OMC's argument therefore fails.

Another contention raised by OMC, relying on *Specialty Coatings*, is that the pollution exclusion should not apply because it was not an "active" polluter. Since this criterion is not mentioned in the pollution exclusion or any other portion of the applicable policies, it is irrelevant in determining whether the exclusion applies. (*Ex-Cell-O Corp.* 702 F. Supp. at 1325.) Moreover, even if we were to follow *Specialty Coatings* and determine the pollution exclusion only applies to active polluters, OMC would not prevail. In *Specialty Coatings*, the court determined defendant was not an active polluter because it delivered waste to a third party. (See *Specialty Coatings*, 180 Ill. App. 3d at 385.) In the case at bar, there was no third party involved; OMC discharged the wastewater containing PCB's into the North Ditch and Waukegan Harbor through its wastewater disposal system. OMC's contention that it was not an active polluter is entirely without merit.

OMC argues that even if, as we have determined, the word "sudden" in the pollution exclusion clause is synonymous with "abrupt," an issue of fact remains as to whether its discharges of PCB's into Waukegan Harbor, the North Ditch, and Lake Michigan were sudden and summary judgment was therefore improper. A motion for summary judgment should be granted only if the pleadings, depositions, affidavits, and admissions on file show that no genuine issues exist as to any material fact and the movant is entitled to judgment as a matter of law. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Summary judgment is a drastic means of resolving litigation which should only be granted if the right of the movant is clear and free from doubt. *Purtill*, 111 Ill. 2d at 240.

In the declaratory judgment action, OMC sought to have its insurers provide a defense and indemnify it with regard to the underlying USEPA and State of Illinois actions. An insurer must defend its insured if the complaint against the insured alleges facts which are within or potentially within policy coverage. (*Scudder v. Hanover Insurance Co.* (1990), 201 Ill. App. 3d 921, 925.) Each of the complaints against OMC alleged that it discharged PCB's into the relevant bodies of water for a period of at least 11 years. At some places, the bottom sediments of these bodies of water were composed of 25% PCB's. There is nothing sudden or abrupt about discharges occurring over an 11-year period. The USEPA and State of Illinois complaints contain

allegations that the pollution in question occurred gradually over a lengthy period of time; this is precisely the type of conduct to which the pollution exclusion was intended to apply. See *Industrial Indemnity Insurance Co. v. Crown Auto Dealerships, Inc.* (M.D. Fla. 1990), 731 F. Supp. 1517, 1521.

The insurers contend that since the duty to defend is dependent upon the allegations of the complaint, the trial court did not have to consider most of the exhibits and affidavits submitted by the parties in connection with the motions for summary judgment. We need not consider whether the trial court should have considered these affidavits and exhibits because they support the trial court's ruling that the pollution exclusion clauses were applicable.

■■■ The evidence submitted by the insurers in connection with their summary judgment motions demonstrates conclusively that OMC discharged Pydraul, the hydraulic fluid which caused the PCB contamination in question, into the waters near its Waukegan facility for a number of years. Excerpts from depositions of OMC officials taken in the USEPA actions indicated that Pydraul was a hydraulic fluid which OMC purchased from Monsanto Company and used in its die-cast machinery in plant number two in Waukegan. The type of Pydraul used by OMC between 1960 and 1971 definitely contained PCB's.

The deposition excerpts further indicated that Pydraul regularly leaked from the die-cast machinery at plant number two onto the floor of the plant. OMC used absorbent material to remove some of the Pydraul from the floor; the remainder was washed into large floor trenches which were designed as repositories for oil and water spills. The trenches at the north end of the plant flowed out through a wall to one oil interceptor while the trenches at the south end flowed out another wall to a different oil interceptor. The interceptors were supposed to collect any oil present in the wastewater and prevent it from being discharged into the waterways near the plant.

Until 1960, the wastewater passing the south interceptor would then go through a sewer known as outfall 009 into the harbor. In 1960, OMC constructed a pump and bypass system which was designed to pump water out of the oil interceptor and divert it through pipes into the North Ditch if the wastewater reached a level which the interceptor could not handle. According to the evidence presented by OMC, Pydraul could only have gotten into Waukegan Harbor from 1960 on if: (1) it leaked out of die-cast machinery; (2) the oil interceptor failed to collect it; and (3) the pump and bypass system failed to divert it to the North Ditch.

The evidence presented by the insurers included a 1959 report from W.D. Hatfield, an environmental consultant. This report states that inefficient operation of oil separators at plants one and two was causing oil slicks in Waukegan Harbor. In August 1967, the North Shore Sanitary District directed OMC to take immediate steps with regard to discharges from the north end of the die-cast building. Shortly thereafter, OMC metallurgist Thomas Banski prepared a water pollution report which states that Pydraul was the primary oil contaminant, and it was flushed from oil separators and discharged into the North Ditch. The report emphasizes the importance of ensuring that the oil separators operate efficiently.

Betz Laboratories, an independent environmental consulting firm hired by OMC, issued a report late in 1968 concerning wastewater handling and treatment at OMC's Waukegan facility. The report states that OMC's oil interceptors were "quite ineffective" because they were not large enough to handle the amount of wastewater discharged from the die-cast area. This would cause considerable turbulence and, as a consequence, some of the Pydraul would not settle in the interceptors. The overflow from both interceptors, according to the report, was pumped into the North Ditch, which was "grossly fouled" because of the Pydraul contamination.

In September 1971, OMC plant manager R.M. Atkin sent a memo to OMC vice-president Carl Ruesch. This memo states that Atkin had recently spoken to an Illinois EPA official about excessive amounts of phenols that had been found in samples taken from North Ditch outfalls. PCB's are a type of phenol. The memo further states, "The north ditch is actually saturated and lined with Pydraul. This means that phenols could show up in our outfalls to Lake Michigan for some time to come." Another internal OMC memorandum written by Atkin on February 2, 1972, states that Pydraul has been discharged into the North Ditch for many years. The memo also states that water samples indicate OMC had been emitting phenols into the North Ditch, and this had occurred since OMC began using Pydraul.

The above reports were all submitted by the insurers as exhibits to their motions for summary judgment. OMC argues that most of this evidence is irrelevant because it concerns contamination of the North Ditch, and OMC is presently seeking recompense only for Waukegan Harbor cleanup costs. OMC presented to the trial court affidavits from environmental experts stating that, in their opinion, the PCB contamination of Waukegan Harbor could have resulted from one or more events which would have caused large torrents of water to flow through its wastewater system such as a major rainstorm, a

flood, or a fire which would have activated sprinklers in the plant. Such events, according to the affidavits, may have caused large PCB globules to leave the oil interceptor and caused the pump and bypass system to fail. This may have caused the PCB globules to go into outfall 009 and then Waukegan Harbor.

We disagree with OMC's contention that evidence concerning the pollution of the North Ditch is irrelevant with regard to the summary judgment proceedings. In its declaratory judgment action, OMC sought a determination that the insurers had a duty to defend it against the USEPA and State of Illinois complaints, each of which contained allegations concerning pollution in the North Ditch. Such evidence is therefore relevant.

Moreover, OMC's contention ignores the fact that the source of the pollution of these two waterways is the same, discharges of PCB-laden Pydraul from its Waukegan plants. The focus of the pollution exclusion provision is conduct resulting in the contamination of land, air, or water. Thus, the provision excludes coverage for personal injury or damage to property "arising out of the discharge, dispersal, release or escape of *** contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water." If such conduct is "sudden and accidental," however, the exclusion does not apply. In the case at bar, the conduct which caused the pollution of Waukegan Harbor, discharges of wastewater containing Pydraul, was the same conduct which resulted in the contamination of the North Ditch. Thus, the fact that the same conduct occurred for at least 11 years and also resulted in contamination of the North Ditch is entirely relevant in determining whether the pollution exclusion applies.

The evidence conclusively establishes that discharges of PCB-laden Pydraul from OMC's Waukegan plants into adjacent waterways took place regularly over a period of at least 11 years. Since, in the context of the pollution exclusion clause, the word "sudden" is synonymous with "abrupt," it is apparent that OMC's Pydraul discharges could not conceivably be considered sudden. Instead, this case involves the type of gradual, long-term pollution to which the pollution exclusion was meant to apply. (*Industrial Indemnity Insurance Co. v. Crown Auto Dealerships, Inc.* (M.D. Fla. 1990), 731 F. Supp. 1517, 1521.) The trial court acted correctly in granting summary judgment to Commercial Union, INA, and Northbrook, and partial summary judgment to Liberty Mutual on the policies with the exclusion.

OMC's policy with International contained a pollution exclusion provision with different language than that contained in the above policies. We must therefore consider separately whether the trial

court's ruling granting summary judgment to International was correct. This provision, contained in a separate endorsement entitled "Contamination and Pollution," states as follows:

"It is agreed this policy shall not apply to liability for contamination or pollution of land, air, or real or personal property or any injuries or damages resulting therefrom caused by an occurrence.

It is further agreed that for the purpose of this endorsement 'Occurrence' means a continuous or repeated exposure to conditions which unexpectedly or unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

As we have seen, the evidence submitted by the insurers established that OMC regularly discharged Pydraul into the surrounding waterways. Since the property damage resulted from repeated exposure to Pydraul discharges, the International pollution exclusion applies if the damage was unexpected or unintended. If the damage was expected or intended, it is clear from an examination of other policy provisions that there would be no coverage, and OMC does not argue otherwise. Therefore, the trial court acted correctly in granting summary judgment to International.

OMC argues that the insurers were estopped from raising the defense of noncoverage because they refused to defend OMC and did not instead defend it under a reservation of rights and seek adjudication of the coverage issue in a declaratory judgment action or a supplemental suit. There is no such estoppel, however, if there is clearly no coverage when the insurance policy and the underlying complaint are examined. (*Scudder v. Hanover Insurance Co.* (1990), 201 Ill. App. 3d 921, 929.) A review of the underlying USEPA and State of Illinois complaints against OMC indicates, as we have previously stated, that no coverage exists because these actions allege discharge of PCB's into the North Ditch and Waukegan Harbor for periods of at least 11 years, and most of the policies exclude coverage for all pollution causing discharges which are not "sudden and accidental." Clearly, there is nothing sudden about discharging pollutants over an 11-year period; thus, there is no estoppel. There is also no estoppel with regard to the International policy since the underlying complaints allege discharge of PCB's into the waterways near OMC for at least 11 years and the policy precludes coverage for pollution

resulting from continuous or repeated exposure to conditions causing injury to property.

Since we have concluded that the insurers were entitled to summary judgment on the issue of the applicability of their pollution exclusion clauses, there is no need to consider whether INA and Commercial Union were also entitled to summary judgment under the "known risk" doctrine. For the above reasons, the orders of the circuit court of Lake County are affirmed.

Affirmed.

UNVERZAGT and WOODWARD, JJ., concur.